IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| GAIL VENTO LLC, by RICHARD G. VENTO, its TAX MATTERS PARTNER | : : : | CIVIL ACTION  No. 09-03 |
| v. | : : | |
| UNITED STATES OF AMERICA | : | |

| | | |
|---|---|---|
| RENEE VENTO LLC, by RICHARD G. VENTO, its TAX MATTERS PARTNER | : : : | CIVIL ACTION  No. 09-04 |
| v. | : : | |
| UNITED STATES OF AMERICA | : | |

| | | |
|---|---|---|
| NICOLE VENTO LLC, by RICHARD G. VENTO, its TAX MATTERS PARTNER | : : : | CIVIL ACTION  No. 09-05 |
| v. | : : | |
| UNITED STATES OF AMERICA | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                **March 28, 2013**

In this consolidated matter, three limited liability companies, Gail Vento LLC, Renee Vento LLC, and Nicole Vento LLC (hereinafter, "Petitioners" or "Petitioner-LLCs"), ask this Court to review the Internal Revenue Service's (IRS) final partnership administrative adjustments to their federal income tax returns for 2001, pursuant to I.R.C. § 6226. As each Petitioner is identically situated with regard to its respective administrative adjustments and petition, this Court held a consolidated nonjury trial in December 2011. Pursuant to Federal Rule of Civil Procedure 52(a), this Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

In 1986, Richard Vento and Tom Johnson founded Objective Systems Integrators, Inc. (OSI), a computer software business that went public in 1995 with Johnson and Vento remaining the majority shareholders. Also in 1995, Vento formed the three Petitioner-LLCs under Colorado law, each one named for one of his daughters: Gail Vento LLC, Renee Vento LLC, and Nicole Vento LLC. These LLCs elected to be treated as partnerships for tax purposes, and each LLC designated Vento as its tax matters partner. Each Petitioner-LLC was owned 99% by its namesake daughter, 0.5% by Vento, and 0.5% by Vento's wife, Lana Vento. In July 2002, the Petitioner-LLCs were merged into a separate LLC.

At various times prior to November 2000, Vento assigned shares of OSI stock to the Petitioner-LLCs and other Vento family-owned entities. As of November 23, 2000, each Petitioner-LLC directly owned 1,584,157 shares of OSI stock and indirectly owned 52,606 shares through its ownership interest in a fourth Vento-family LLC, for a total of 1,636,763 shares. Each Petitioner-LLC's Articles of Incorporation states "no member may purchase, transfer or assign any interest in the company without the written approval of all the members of the company." Tr. Exs. 1-3, at ¶ "SEVENTH."

In early 2000, OSI retained the investment banking firms Gerard Klauer Mattison & Co. Inc. (GKM) and Adams, Harkness & Hill, Inc. (AHH) to help solicit offers for the purchase of OSI. During the latter half of 2000, a Special Committee appointed by the Board of Directors of OSI worked with GKM and AHH to investigate and negotiate the sale of OSI. On November 16, 2000, Agilent Technologies, Inc. (Agilent) made a non-binding tender offer to acquire all shares of OSI for $17.75 per share in cash. On November 21, 2000, the OSI Board of Directors held a

special meeting at which it approved Agilent's tender offer, subject to certain conditions set forth in the minutes of that meeting.[1]

On Friday, November 24, 2000 (the day after Thanksgiving), the OSI Board of Directors held a special meeting at which it gave final approval to the cash tender offer from Agilent to purchase all shares of OSI for $17.75 per share. The meeting began at 10:15 a.m. PST, and Vento attended this meeting by telephone. The minutes of this meeting are very brief, and there is no evidence the meeting was unusually long. According to the Schedule 14D-9 OSI filed with the Securities and Exchange Commission (SEC) on December 6, 2000, OSI and Agilent entered into a formal Agreement and Plan of Merger on November 24, 2000, whereby Agilent would initiate a tender offer for all outstanding shares of OSI stock for $17.75 per share. The Agreement and Plan of Merger included a Tender and Voting Agreement also dated November 24, under which the owners of OSI stock agreed to tender their shares of OSI stock within 10 days to an acquisition company controlled by Agilent in connection with the planned merger. The agreement identified the Petitioner-LLCs, along with other parties, as owners of the stock being sold, and restricted the ability of these OSI stockholders to transfer the OSI shares to third parties prior to sale. At the close of trading on November 24, OSI stock was quoted on NASDAQ at $13.50 per share.

The Agreement and Plan of Merger was filed with the SEC on the following Monday, November 27, 2000. That same day, OSI and Agilent issued press releases announcing the merger. The sale of 100% of OSI's stock eventually closed on January 8, 2001. The Ventos and

---

[1] The minutes state the tender offer is accepted subject to any changes approved by any Executive Officer, and that the Board may withdraw, withhold, amend, or modify its recommendation that the stockholders tender their shares in the exercise of the Directors' fiduciary duties. The minutes also reflect that the corporation's stockholders shall vote on the merger if required under the law.

3

their family-owned entities received approximately $180,000,000 from the sale of OSI stock to Agilent. Of that total, each of the Petitioner-LLCs received approximately $28,000,000.

On the morning of November 24, 2000, Vento retained Houston, Texas, attorney Robert Colvin to execute on behalf of himself and each of his three daughters "Purchase Agreements" transferring a percentage of the interests in Gail Vento LLC, Renee Vento LLC, and Nicole Vento LLC to newly formed tax-exempt Cayman Island entities in exchange for deferred private annuities. Vento and Colvin only spoke by phone and had never met or spoken prior to the morning of November 24. Vento did not explain to Colvin the details of the pending OSI merger, and Colvin was not provided with copies of the November 16, 2000, tender offer or minutes of the November 21 or 24 OSI Board meetings approving the merger. Vento, however, did tell Colvin he was in the process of negotiating the sale of OSI, which was moving along quickly, and therefore desired the transactions to be completed before the end of November 24. Colvin testified that had he been aware of the November 24 Agreement and Plan of Merger, it might have affected his advice to Vento.

Colvin thereafter began working with an Atlanta, Georgia-based attorney for a Cayman Islands insurance company, Lighthouse Capital Insurance Company (Lighthouse), on a number of transactions to achieve Vento's desired objective. Lighthouse formed three Cayman Island companies: Silly Point Ltd., Mid-Off Ltd., and LBW Ltd. (collectively, "the Cayman Entities").

Colvin drafted four Purchase Agreements, three of which are at issue in this case. One Purchase Agreement stated Gail Vento was transferring an 18.94% interest in Gail Vento LLC to Silly Point Ltd.; a second Purchase Agreement stated Renee Vento was transferring an 18.94% interest in Renee Vento LLC to Mid-Off Ltd.; and a third stated Nicole Mollison was transferring an 18.94% interest in Nicole Vento LLC to LBW Ltd. All three Purchase Agreements stated that

4

the parties agreed the fair market value of each 18.94% interest was $4,050,000. Colvin testified at trial he calculated this value based on the closing price of OSI shares on NASDAQ on November 24, 2000 ($13.50 per share).

The Purchase Agreements further provided that in exchange for acquiring the stated ownership interests in each LLC, the corresponding Cayman Entities would pay the corresponding Vento daughter $772,871.26 per year, for each year of Lana Vento's life, beginning on November 24, 2007. Thus, if Lana Vento died before November 24, 2007, the Cayman Entities would have no obligation to pay those amounts.

The Purchase Agreements were executed by Vento on behalf of Gail Vento, Renee Vento, and Nicole Mollison under the authority of Limited Powers of Attorney. The Limited Powers of Attorney state they are "to be effective the 24th day of November, 2000." Tr. Exs. 20-22. Petitioners, however, did not offer any evidence as to the dates on which each Vento daughter actually signed her Limited Power of Attorney. Colvin, Petitioners' only trial witness, testified he believed they were signed on November 24, 2000, but he had never seen the daughters' signatures before and at least two Powers of Attorney appear to have been faxed to Colvin after November 24.

On December 5, 2000, Colvin sent an email to Vento and others about several documents from the "Lighthouse Transaction" Colvin needed but had not yet received. Tr. Ex. 28. The email states:

> We have not been receiving anything back from your side despite our expedited efforts to prepare and forward documents and repeated requests. We urgently need the following from you:
> . . .
> 5. Return our firm's signed engagement letter and retainer[;]
> 6. Signed clean copies of each Purchase Agreement[;]
> . . .

5

> 8. Copies of Powers of Attorneys signed by daughters with respect to Dick [Vento's] acting on their behalf for sale of LLC interests and the Demand Note[;]
>
> . . . .
>
> The Caymans will soon shut down for the holidays, which adds an additional level of urgency.

*Id.* At trial, Colvin testified his email does not indicate those documents had not been signed as of December 5, 2000; rather, he contended he was simply requesting "clean" versions of those documents to prepare closing binders for the transactions.

On May 2, 2001, Vento authorized Irvin L. Crawford, the Ventos' investment advisor at Salomon Smith Barney (SSB), to transfer $4,050,000 from the SSB account of each Petitioner-LLC to its corresponding Cayman Entity. On June 4, 2001, Vento authorized Crawford to transfer an additional $1,275,000 from the account of each Petitioner-LLC to its corresponding Cayman Entity. On June 8, 2001, each Petitioner-LLC redeemed, i.e., repurchased, the 18.94% ownership interest previously transferred to its respective Cayman Entity in exchange for the sum of the May 2 and June 4 transfers, totaling $5,325,000.[2] After the redemptions, the Cayman Entities no longer held any interest in the Petitioner-LLCs. Colvin testified the redemption of the Petitioner-LLCs' interest did not affect the Cayman Entities' annuity obligations to the Vento family members, but there is no evidence the Cayman Entities have or have not been making such payments since November 24, 2007, as stipulated in the Purchase Agreements.

On December 31, 2001, Vento instructed Crawford to change the title and Tax ID number of the accounts held by the Petitioner-LLCs to that of V.I. Derivatives, LLC, a Virgin Islands LLC formed in August 2001. Based on Vento's letter, SSB did not issue a Form 1099 to

---

[2] The $4,050,000 transfer equals the value of the 18.94% interest stipulated in the Purchase Agreements and based on the $13.50-per-share closing price of OSI stock on November 24, 2000. The $5,325,000 total transfer sum, however, approximately equals 18.94% of each Petitioner-LLC's value based on the $ 17.50-per-share sale price paid by Agilent. The purpose of the second $1,275,000 transfer thus appears to have been to account for this price difference.

the IRS reporting the Ventos' sale of their OSI stock, and the income from the sale of the stock was not reported to the IRS. *See VI Derivatives, LLC v. United States*, No. 06-12, 2011 WL 703835, at *6 (D.V. I. Feb. 18, 2011). The Petitioner-LLCs filed Form 1065 partnership returns for 2001 with the IRS, each signed by Vento. These returns reported the income from the OSI stock sales on January 8, 2001, as flow-through income originating with V.I. Derivatives, LLC. The Petitioner-LLCs issued Schedule K-1s to the Cayman Entities for 2001, allocating to each a portion of the income resulting from the sale of the OSI stock. Because the Cayman Entities are non-tax entities, no income tax was paid on their purported gain from the sale of OSI. In each of their 2001 returns, the Petitioner-LLCs claimed the basis in the OSI stock should be adjusted upward as a result of the transfers to the Cayman Entities.[3]

In 2004, the Ventos sought the advice of attorneys on whether to terminate the annuities acquired from the Cayman Entities. One firm advised them the sale of the Petitioner-LLC interests to the Cayman Entities likely violated the assignment of income doctrine because the essential terms of the Agilent merger had been agreed upon when the interests were transferred. The attorneys opined that if the IRS investigated the transaction, it would likely require the Petitioner-LLCs to pay tax on the gain from the sales of all their OSI shares, including the proportion designated as income only to the Cayman Entities. The attorneys recommended the Petitioner-LLCs amend their 2001 returns and pay the tax. Petitioners, however, did not follow this advice.

On October 9, 2008, after examining the 2001 partnership returns by Petitioners, the IRS issued a Notice of Final Partnership Administrative Adjustment (FPAA) to each Petitioner for

---

[3] The Petitioner-LLCs also claimed in their 2001 returns the gain from the OSI stock qualified for partial non-recognition pursuant to I.R.C. § 1202; however, the parties agree none of the gain qualified as such.

2001.  The FPAAs (1) clarified that the gain from the sale of the OSI stock was income of Petitioners; (2) disallowed the allocation of income made to the Cayman Entities and re-allocated that income back to Petitioners; and (3) disallowed the adjustments to Petitioners' basis in the OSI stock.[4]  The FPAAs also determined each Petitioner was liable for two non-cumulative, accuracy-related monetary penalties at the partnership level: (1) a penalty for negligence or disregard of rules and regulations pursuant to I.R.C. § 6662(b)(1); or, in the alternative, (2) a penalty for substantial understatements of tax pursuant to § 6662(b)(2).  The Government has conceded, however, the penalty for substantial underpayment pursuant to § 6662(b)(2) does not apply, and it does not ask the Court to sustain this penalty.

On January 5, 2009, Petitioners each filed a petition for readjustment of partnership items pursuant to I.R.C. § 6226.  A consolidated bench trial was held in December 2011.

**CONCLUSIONS OF LAW**

Generally, the determinations in an FPAA are presumed correct and the petitioner bears the burden of proving such determinations are in error.  *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Comm'r*, 107 T.C. 94, 104 (1996).  If the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability, the burden shifts to the Government with respect to that issue.  I.R.C. § 7491(a).

The Government asserts four theories under which the Petitioner-LLCs' allocation of income from the sale of OSI stock and the corresponding reduction in their flow-through tax liabilities resulting from the purported sale of interest in the Petitioner-LLCs to the Cayman Entities should be disallowed: (1) the "assignment of income" doctrine places the entire tax

---

[4] The FPAAs also disallowed the partial non-recognition of gain claimed under I.R.C. § 1202, which Petitioners concede.

burden from the sale of OSI stock on Petitioners; (2) the sale of interest in the Petitioner-LLCs to the Cayman Entities lacked economic substance; (3) the sale and subsequent redemption of interest in the Petitioner-LLCs fails the step-transaction test; and (4) the sale and subsequent redemption of interest violates the partnership anti-abuse rule, 26 C.F.R. § 1.701-2. This Court finds Petitioners are not entitled to readjustment of the FPAAs based on the assignment of income doctrine. The Court, therefore, need not determine whether the FPAAs were proper under the Government's other theories.

Taxation is based upon a transaction's substance rather than its form. *Lerman v. Comm'r*, 939 F.2d 44, 54 (3d Cir. 1991) (citing *Gregory v. Helvering*, 293 U.S. 465, 469-70 (1935)). If property is transferred and the right to income with respect to the property has already matured at the time of transfer, the transferor will be taxed on the income. *Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945). This principle is often referred to as the "assignment of income" or "anticipatory assignment of income" doctrine. *See Ferguson v. Comm'r*, 174 F.3d 997, 1003 (9th Cir. 1999) ("Under the anticipatory assignment of income doctrine, once a right to receive income has 'ripened' for tax purposes, the taxpayer who earned or otherwise created that right, will be taxed on any gain realized from it, notwithstanding the fact that the taxpayer has transferred the right before actually receiving the income."). Thus, a salary is taxed to the person who earns it, and she cannot escape such tax through arrangements assigning the right to receive the salary to someone else. *Lucas v. Earl*, 281 U.S. 111, 114-15 (1930). Similarly, income from other forms of property is taxed to the owner of that property when the gain is "realized," even if the property is assigned before the income is actually obtained. *Helvering v. Horst*, 311 U.S. 112, 116-17 (1940).

The assignment of income doctrine is applicable in cases where appreciated property is transferred shortly before a fully negotiated sale is formally consummated. In *Court Holding Co.*, 324 U.S. at 333, a corporation that owned an apartment building began negotiations with another party to sell the building. An oral agreement was reached as to the terms and conditions of sale and the terms were later reduced to writing. The next day, the corporation transferred title to the apartment building to its only two individual shareholders. A sale contract was then drawn between the individuals and the buyers and the sale was executed. The Supreme Court affirmed the Tax Court's ruling that the corporation was liable for the income on the gain from the sale. *Id.* at 333-34. The Court reasoned:

> The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title.

*Id.* at 334.

In a case with facts similar to those presently before the Court, the Ninth Circuit Court of Appeals held gain from sale of stock pursuant to a merger was attributable to individuals who transferred the stock to charities after an agreement of merger, but before the merger was technically effectuated. *Ferguson*, 174 F.3d at 1006. In determining when the right to the income ripened, the Court focused on the time when "the surrounding circumstances were sufficient to indicate that the tender offer and the merger were practically certain to proceed by the time of their actual deadlines," rather than "mere formalities and remote hypothetical possibilities." *Id.* at 1004. The Court found that before the petitioners transferred their stock, it had become "quite unlikely" the merger would fail, noting the tender offer had gained significant

momentum and all parties sought to benefit from the merger. *Id.* at 1005. It therefore held the assignment of income doctrine located the gain from the eventual merger with the petitioners. *Id.*; *see also Peterson v. Comm'r*, 51 T.C.M. (CCH) 1300 (1986) (holding the existence of possibilities that shareholders would not tender shares to effectuate a merger did not preclude a finding of a fixed right to receive income from the eventual sale of stock even though not a single publicly held share had been tendered before petitioner transferred his right to the sale proceeds).

In this case, the very earliest that the sale of interest in the Petitioner-LLCs to the Cayman entities could have occurred is after the close of the markets on November 24, 2000, given Colvin valued the transactions using the closing NASDAQ stock price of OSI shares, and thus well after OSI gave the final approval to Agilent's cash tender offer and entered into the Agreement and Plan of Merger.[5] The terms of the sale of the Petitioner-LLCs' stock were negotiated and agreed to. All that was left was for OSI shareholders to convey their stock to Agilent, and the Ventos and OSI co-founder Tom Johnson, who together owned the majority of OSI shares, had already voted for the merger and were expressly bound to sell their shares pursuant to the Tender and Voting Agreement. The record shows when the merger agreement was finalized on November 24, 2000, there was no real risk that the merger would not occur. In fact, the very next business day, OSI and Agilent issued press releases announcing the merger. Moreover, Vento's urgency in demanding the Purchase Agreements be executed on November 24 to minimize Petitioners' tax burden demonstrates his belief the merger was all but final.

---

[5] The record shows, in fact, the transfer likely occurred several days after November 24. Colvin's December 5, 2000, email to Vento "urgently" requesting signed Purchase Agreements and Powers of Attorney indicates several of the documents necessary for the sales were not executed until after December 5, 2000. Colvin's warning that the Cayman Islands would soon shut down for the holidays belies his rationalization that he was merely asking for copies to make a closing binder.

Petitioners' right to the gain from the sale of their OSI stock, therefore, ripened prior to the transfers of interest to the Cayman Entities. Accordingly, Petitioners are liable for the tax on all of the gain from the OSI stock sales, and the determinations in the FPAAs regarding the tax consequences of those transactions are correct.

The FPAAs also properly assessed each Petitioner an accuracy penalty of 20% of the portion of underpaid tax due to Petitioners' negligence and disregard of rules and regulations pursuant to I.R.C. § 6662(a) and (b)(1). "'Negligence' can include any failure to make a reasonable attempt to comply with the provisions of the [Internal Revenue] Code, to exercise ordinary and reasonable care in the preparation of a tax return, to keep adequate books and records, or to substantiate items properly." *Neonatology Assocs., P.A. v. Comm'r*, 299 F.3d 221, 233 (3d Cir. 2002) (citing I.R.C. § 6662(c); Treas. Reg. § 1.6662-3(b)(1)).

The record shows Vento failed to explain to Colvin the details and imminence (and later finalization) of the Petitioner-LLCs' sale of 100% of their OSI stock to Agilent. Moreover, Vento attempted to prevent the IRS from learning about the OSI stock sale by changing the Tax ID number associated with the Petitioner-LLCs' bank accounts to that of a Virgin Islands LLC. He also filed 2001 returns attributing the sale of OSI stock to the same Virgin Islands LLC even though that entity was created eight months after the sale. Considering these acts together, this Court finds Vento's conduct leading to the inaccurate tax reporting was at least negligent. The 20% penalties in the FPAAs are therefore proper as well.

An appropriate Judgment follows.

                                                BY THE COURT:

                                                /s/ Juan R. Sánchez
                                                Juan R. Sánchez, J.